**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LETITIA JAMES, Attorney General of the State of New York on behalf of the People of the State of New York,<br>*Plaintiff*,<br>v.<br>QCX LLC d/b/a POLYMARKET US,<br>*Defendant*. | Case No.: 26-cv-8338<br>Supreme Court of the State of New York, County of New York, Index No. [______]<br>NOTICE OF REMOVAL TO FEDERAL COURT |

## NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1441(a), 1442(a) and 1446, Defendant QCX LLC d/b/a Polymarket US ("Polymarket US"), by and through its attorneys, hereby removes the above-captioned action from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York.

This Notice of Removal is not intended to constitute and should not be construed as constituting the general appearance or appearance on the merits of Polymarket US in this matter. By filing this Notice of Removal, Polymarket US does not waive any defenses it has to this action whether in state or federal court, including, but not limited to, improper service of process. Polymarket US reserves the right to amend or supplement this Notice of Removal.

In support of removal, Polymarket US states as follows:

## BACKGROUND

1. Prediction markets, exchanges that trade a kind of derivative financial instrument known as event contracts, are an important component of modern, federally regulated financial markets. Hundreds of thousands of U.S. consumers—and millions worldwide—rely on these markets to obtain real-time, accurate information about consequential events in politics, finance,

technology, news, and sports. Through the Commodity Exchange Act ("CEA"), Congress placed these markets squarely within a comprehensive federal regulatory regime and vested exclusive supervisory authority in the Commodity Futures Trading Commission ("CFTC").

2. Polymarket US operates a federally licensed designated contract market that offers event contracts. Event contracts are a type of "swap," a financial contract where two parties agree to exchange—swap—payments with each other based on a pre-agreed formula, such as the price of crude oil or interest rates. For event contracts, the payoff "may be based on eventualities and measures as varied as the world's population in the year 2050, the results of political elections, or the outcome of particular entertainment events." Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,669, 25,669 (May 7, 2008). Polymarket US offers event contracts subject to and in compliance with the CFTC's regulatory oversight and federal law.

3. The CFTC itself has confirmed through litigation, amicus briefs, and public statements that event contracts traded on designated contract markets fall squarely within its exclusive federal authority—including in its pending suit and preliminary-injunction motion against New York. *See* Complaint ¶ 1, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. Apr. 24, 2026), Dkt. 1 ("CFTC N.Y. Compl."); CFTC's Mot. for Preliminary Injunction at 2, *United States v. New York*, No. 1:26-cv-03404 (S.D.N.Y. May 1, 2026), Dkt. 35. Other courts have granted requests from the CFTC to enjoin state interference with event-contract markets. *See*, *e.g.*, *United States v. Minnesota*, 2026 WL 2150211, at *1 (D. Minn. July 27, 2026). And the Third Circuit agreed that regulatory authority over these contracts belongs to the CFTC, not the States. *See KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026).

4. This Court, too, has held that "trading on or the operation of a [contract] market" is a "matter[] for uniform federal regulation," not "for review or adjudication by individual state courts." *DGM Investments, Inc. v. N.Y. Futures Exch., Inc.*, 2002 WL 31356362, at *5 (S.D.N.Y. Oct. 17, 2002).

5. The State of New York has chosen to invade the CFTC's exclusive jurisdiction anyway. It sued Polymarket US in state court, seeking an order shutting down Polymarket US's federally regulated operations in New York, restitution, disgorgement, and civil and criminal penalties. *See* Pet. at 29–31 (attached hereto as Exhibit A). That order would directly conflict with federal law and intrude upon the CFTC's exclusive and comprehensive authority to regulate exchange-traded derivatives markets nationwide.

6. CFTC-licensed exchanges like Polymarket US are subject to exclusive federal oversight, not state regulation. Allowing state regulators to shut down derivatives trading by rushing to state courts would fracture the uniform national framework that Congress designed and that the CFTC alone may police.

7. This Court has jurisdiction under 28 U.S.C. § 1331. Plaintiff alleges violations of the federal Wire Act, 18 U.S.C. § 1084(a), a federal law over which this Court has original jurisdiction. Pet. ¶¶ 141–45. Additionally, Plaintiff's state-law claims necessarily turn on disputed questions about the meaning and scope of the federal CEA. For example, to succeed on its claims under the Penal Law, Pet. ¶¶ 101–16, Plaintiff must establish that Polymarket US's event contracts are "unlawful gambling," which requires Plaintiff to grapple with their legality under the CEA. And Plaintiff's own theory confirms that what Plaintiff calls "gambling" is what the CEA calls "swaps." Again, this Court is the proper forum to resolve those questions of federal law.

8. This Court also has jurisdiction under 28 U.S.C. § 1442 because Plaintiff's suit directly targets Polymarket US's "act[ions] under" the CFTC. 28 U.S.C. § 1442(a)(1). In operating a designated contract market, Polymarket US acts as a "self-regulatory organization" exercising delegated authority from the CFTC. As a self-regulatory organization, Polymarket US does not merely comply with the federal regulatory regime. It is a "front-line regulator[]" that assists the CFTC by performing regulatory functions the federal agency itself would otherwise carry out. CFTC Staff Advisory at 1, CFTC Ltr. No. 26-08 (Mar. 12, 2026). And those functions—regulating market access, certifying event contracts for listing, and promulgating and enforcing rules to promote fair and equitable trading and to protect the market and market participants—are exactly what Plaintiff's suit challenges. Because Plaintiff's state-court lawsuit seeks to interfere with the federal government's exclusive authority and the system of self-regulation Congress created, Polymarket US is entitled to have its federal preemption defense in federal court.

## I. Federal Regulatory Authority

9. Defendant Polymarket US operates a federally regulated derivatives exchange on which users nationwide trade event contracts—derivative financial instruments that constitute "swaps" under the CEA. *See* 7 U.S.C. § 1a(47)(A)(ii); *see*, *e.g.*, CFTC N.Y. Compl. ¶¶ 6–7; *United States v. Minnesota*, 2026 WL 2150211, at *11–12 (D. Minn. July 27, 2026).

10. On July 9, 2025, the CFTC formally approved Polymarket US as a designated contract market under the CEA—a designation reflecting an extensive federal finding that Polymarket US satisfies stringent requirements that govern derivatives trading on federal exchanges, including with respect to market integrity, access, transparency, financial safeguards, surveillance, and customer protection. *See* 7 U.S.C. §§ 7(a), 7(d), 8(a).

11. When it comes to exchange-traded event contracts, Congress could not have been clearer: The CFTC exercises "exclusive jurisdiction" over transactions involving swaps traded or executed on a designated contract market. 7 U.S.C. § 2(a)(1)(A). That exclusivity leaves no room to target federally regulated derivatives markets with state licensing regimes, enforcement actions, or injunctive relief.

12. Polymarket US operates in compliance with the CFTC's comprehensive regulatory regime, including the CEA's 23 core principles and all CFTC rules governing market participant access, contract design, surveillance, enforcement, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151.

**II. New York's Suit Directly Conflicts With Federal Law.**

13. Despite this exclusive federal regime, on September 24, 2026, the State of New York sued Polymarket US in state court, principally on the theory that federally regulated event contracts constitute unlawful "gambling." Relying on this state-law theory, Plaintiff sought a temporary restraining order, preliminary injunction, and permanent injunction to immediately block Polymarket US from continuing its operations in New York, as well as damages, restitution, and disgorgement.

14. The Petition purports to state a claim against Polymarket US under New York's Constitution Article I, Section 9; New York Penal Law §§ 225.05, 225.10, and 225.20; New York Racing, Pari-Mutuel Wagering and Breeding Law ("Racing Law") §§ 1367(16)(a), 1367-a(2)(a), and 1367-a(4)(b); New York Executive Law § 63(12); and the federal Wire Act, 18 U.S.C. § 1084, for Polymarket US's offering of *federally regulated* events contracts subject to the CFTC's exclusive jurisdiction. Pet. ¶¶ 95–154.

15. Plaintiff's theory is that Polymarket US's activities constitute "gambling" because they involve "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." Pet. ¶ 24 (citing Penal Law § 225.00(2)). In Plaintiff's view, offering those event contracts is unlawful under New York state law prohibiting promotion of gambling in the first degree, Penal Law § 225.10; promotion of gambling in the second degree, Penal Law § 225.05; possessing gambling records in the first degree, Penal Law § 225.20; offering unauthorized sports wagering, Racing Law § 1367(16)(a); administering an unlicensed mobile sports wagering platform, Racing Law § 1367-a(2)(a); and operating and promoting an unlicensed platform, Racing Law § 1367-a(4)(b). Pet. ¶ 13.

16. Additionally, Plaintiff claims Polymarket US has violated the Wire Act by using wire communication facilities, namely the internet, "for the transmission in interstate commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers." Pet. ¶¶ 143–44.

17. As relief, Plaintiff requests (1) a permanent injunction enjoining and restraining Polymarket US's operations, (2) an accounting of all bets placed, monies lost by customers, and monies paid to Polymarket US in connection with its provision of event contracts, (3) restitution, disgorgement, damages, and penalties, (4) a penalty of three times the amount of Polymarket US's gain from the alleged illegal practices, (5) penalties of $100,000 for each offer or attempt to offer sports wagering or mobile sports wagering within or from New York, (6) granting costs of $2,000 to New York, and (7) any such other and further relief as the Court deems proper. Pet. ¶ 14.

18. In addition to the Petition, Plaintiff has moved the court for a temporary restraining order to halt Polymarket US's federally regulated activity.

19. Polymarket US will demonstrate that Plaintiff's Petition fails as a matter of law because event contracts may be lawfully purchased and traded in New York on a designated contract market. Polymarket US's event contracts are not subject to State regulation as "gambling" or "wagering." Congress expressly granted the CFTC—not the States—"exclusive jurisdiction" over exchange-traded event contracts. 7 U.S.C. § 2(a)(1)(A); *see KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. 31 ("CFTC Sixth Cir. Amicus Br.") at 1. It authorized the CFTC—not the States—to determine whether event contracts involve "gaming" and whether they may be listed or must be prohibited in the public interest. 7 U.S.C. § 7a-2(c)(5)(C). And it did so to ensure that regulation of "market participants" remains "under the oversight of the *Commission*," 7 U.S.C. § 5(b) (emphasis added)—and no "other regulatory agencies," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982).

20. New York's attempt to override and usurp the CFTC's exclusive federal authority through state-law declarations, injunctions, and monetary damages conflicts with the regime Congress established.

**FIRST GROUND FOR REMOVAL: FEDERAL QUESTION JURISDICTION**

21. To start, this case belongs in federal court because the Petition asserts a claim for violations of the Wire Act, 18 U.S.C. § 1084(a). Pet. ¶¶ 91, 141–45.

22. This Court has original jurisdiction in "all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and removal jurisdiction in "any civil action" over which it has original jurisdiction, *id.* § 1441(a).

23. Claims for violations of the Wire Act "arise[] under federal law" because "federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). That is sufficient to provide this Court with original jurisdiction such that removal is proper under 28 U.S.C. § 1441. *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005) ("A single claim over which federal-question jurisdiction exists is sufficient to allow removal.").

24. Even without the Wire Act claim, this case also belongs in federal court because it necessarily turns on disputed and substantial questions of federal law. That is, Plaintiff's claims require the adjudication of federal-law issues that are "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258 (citing *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313–14 (2005)).

25. Polymarket US operates a lawful, nationwide designated contract market subject to the CFTC's exclusive jurisdiction. The core question is whether the State of New York may nonetheless impose its state statutory regime on Polymarket US's federally licensed derivatives exchange. That question cannot be answered without interpreting the scope and effect of the CFTC's exclusive jurisdiction under the CEA.

26. In other words, all of Plaintiff's state law claims necessarily require proof that the event contracts at issue are either illegal gambling, illegal bookmaking, or unlawful sports wagering—and those claims cannot be adjudicated without deciding disputed and substantial questions of federal law.

27. Take, for example, Plaintiff's claim that Polymarket US has violated New York's constitutional prohibition on "lotter[ies] or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling." N.Y. Const. art. I, § 9. Pet. ¶¶ 13, 22 (citing N.Y. Const. art. I,

§ 9). Plaintiff alleges that, by operating its platform, Pet. ¶ 13, Polymarket US engages in illegal gambling and bookmaking. But both the definition of "gambling" and "bookmaking" require Plaintiff to grapple with federal law.

28. *First*, as to gambling, New York courts have recognized that whether a lottery or gambling is unlawful under New York law depends on whether the contract is unlawful under the law governing its validity. For example, in *Thatcher v. Morris*, the New York Court of Appeals explained that even though the sale of a lottery ticket was "prohibited" by the State, a lottery contract that is otherwise "valid by the laws of the place where made and to be performed, it would be upheld by the courts of this state." 11 N.Y. 437, 438–40 (1854); *Intercontinental Hotels Corp. (Puerto Rico) v. Golden*, 203 N.E.2d 210, 214 (N.Y. 1964) (applying "the consistent practice of enforcing rights validly created by the laws of a sister State"); *accord Mashantucket Pequot Gaming Enter. v. Renzulli*, 728 N.Y.S.2d 901, 902 (Sup. Ct. Suffolk Cnty. 2001) ("[G]ambling debt will not be enforced in New York unless it was validly contracted in another jurisdiction and is enforceable there."). Similarly, whether the challenged event contracts here are unlawful gambling contracts cannot be determined by reference to New York law alone. *See Gen. Elec. Co. v. Metals Res. Grp. Ltd.*, 741 N.Y.S.2d 218, 219 (1st Dep't 2002) (distinguishing between "an illegal contract to gamble" and "a legitimate commodity swap agreement"). Plaintiff's ability to obtain relief thus depends on whether the challenged event contracts are unlawful under the law governing their validity—an issue which necessarily requires Plaintiff to grapple with the CEA. *Frankfurter v. Silverman*, 208 N.Y.S. 405, 407 (N.Y. City Ct. 1925) ("The burden of proof that the transaction is a gambling one is for the party asserting it.").

29. *Second*, as to bookmaking, New York courts have defined this term as "making, registering, or recording bets or wagers," *Chapin v. Austin*, 300 N.Y.S. 932, 934 (Sup. Ct. Nassau

Cnty. 1937), or otherwise as the "process in which a bookmaker prepares a schedule of odds and solicits bets," *White v. Cuomo*, 38 N.Y.3d 209, 221 n.3 (2022). New York courts have also differentiated between lawful contracts and "bets" or "wagers." For example, in *Bigelow v. Benedict*, the Court considered whether a contract for the sale of gold was a "gambling transaction" or "wager" or instead a "valid[]" "contract for the sale of gold." 70 N.Y. 202, 206–07 (1877). And in *Liss v. Manuel*, the court explained that "an investment" or "a contract involving goods, commodities, work, labor or services" is "an approved and judicially enforceable mode or form of business" and distinguishable from "a bet, wager, or illegal gamble." 296 N.Y.S.2d 627, 631 (Civ. Ct. N.Y. Cnty. 1968). Because Plaintiff's ability to obtain relief also depends on whether the challenged event contracts are "valid" or "approved and judicially enforceable mode[s] or form[s] of business," this allegation too, requires Plaintiff to grapple with the CEA.

30. Similarly, Plaintiff's claims that Polymarket US has violated New York's criminal prohibitions on unlawful "gambling" and/or "bookmaking" under New York Penal Law §§ 225.05, 225.10, and 225.20 also require Plaintiff to grapple with federal law. Each of these statutes require Plaintiff to prove that the alleged gambling or bookmaking is "unlawful." *See* N.Y. Penal Law §§ 225.05 ("A person is guilty of promoting gambling in the second degree when he knowingly advances or profits from *unlawful* gambling activity.") (emphasis added), 225.10 ("A person is guilty of promoting gambling in the first degree when he knowingly advances or profits from *unlawful* gambling activity . . . .") (emphasis added), 225.20 (proscribing "possession of gambling records . . . used in the operation or promotion of a bookmaking scheme or enterprise," where "bookmaking" is defined in part as "*unlawfully* accepting bets" in 225.00(9)) (emphasis added). The Penal Law defines "unlawful" as "not specifically authorized by law." *Id.* § 225.00(12). Here too Plaintiff must contend with the CEA—the federal framework through

which Polymarket US has been licensed and authorized to operate a prediction market. *See Gen. Elec. Co.*, 741 N.Y.S.2d at 219–20 (affirming plaintiff's recovery of sums due under "the parties' commodity swap contract" because "the parties' contract was not an illegal contract to gamble, but rather a legitimate commodity swap agreement").

31. And finally, Plaintiff's claims for violations of the New York Racing Laws §§ 1367 and 1367-a require Plaintiff to grapple with federal law. To prove a violation of these statutes, Plaintiff must demonstrate that Polymarket US has engaged in unlicensed "sports wagering." N.Y. Racing Law §§ 1367(16)(a), 1367-a(2)(a), 1367-a(4)(b). The Racing Law defines "sports wagering" in relevant part as "wagering on sporting events." *Id.* § 1367(1)(x). As with Plaintiff's other claims, the undefined term "wager" still requires Plaintiff to grapple with whether Polymarket US's event contracts are valid event contracts under the CEA or unlawful wagers. *Bigelow*, 70 N.Y. at 206–07. *Supra* ¶ 29.

32. In sum, Plaintiff's claims thus raise two issues: (1) whether Polymarket US's event contracts are "valid" or "authorized by law" such that they fall outside the reach of the State's "gambling" prohibitions; and (2) whether Polymarket US's federally regulated event contracts are valid and enforceable contracts such that they do not fall within the definition of a "bet" or "wager" and thus are outside of the reach of the State's prohibitions. Each issue necessarily requires Plaintiff to contend with federal law.

33. *First*, Polymarket US's event contracts are lawful, valid swaps under the CEA. The CEA defines "swap" broadly, 7 U.S.C. § 1a(47)(A), such that Polymarket US's event contracts fall within the definition of "swap." That means they are "valid" and "specifically authorized by law." N.Y. Penal Law § 225.00(12).

34. *Second*, as many New York courts have recognized, *see supra* ¶¶ 28–29, there is a difference between a "bet" or "wager" and a "valid" or "judicially enforceable" contract.

35. "As a result, whether the contracts at issue are unlawful gambling contracts—or instead federally authorized event contracts—cannot be resolved by reference to [New York] law alone." *Ga. Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375, at *3 (M.D. Ga. Feb. 3, 2026). Therefore, "[p]laintiff's ability to sustain a claim upon which relief may be granted necessarily depends on the interpretation and application of the CEA and the scope of the CFTC's exclusive jurisdiction." *Id.*

**SECOND GROUND FOR REMOVAL: FEDERAL OFFICER REMOVAL**

36. The federal officer removal statute guarantees Polymarket US the right to have its federal preemption defense heard by a federal court. As a self-regulatory organization, Polymarket US exercises delegated authority under the supervision of the CFTC to carry out functions the CFTC itself would otherwise perform. And Plaintiff's suit directly targets the way Polymarket US exercises that delegated authority.

37. The federal officer removal statute authorizes removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The Supreme Court has emphasized that "the statute must be 'liberally construed'" and that "[t]he words 'acting under' are broad." *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007). Likewise, "[t]he phrase 'relating to' sweeps broadly," and "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1060 (2026).

38. Federal officer removal "is an exception to the well-pleaded complaint rule," allowing "suits against federal officers to be removed despite the nonfederal cast of the complaint." *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006) (alterations adopted). When assessing removal, courts credit the removing party's plausible allegations, *Plaquemines*, 146 S. Ct. at 1061, including the defendant's "theory of the case" for purposes of the "jurisdictional inquiry," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999).

39. Polymarket US satisfies the three-part test for federal officer removal because (1) it is "a person" acting under the CFTC and its officials, (2) this suit is "for or relating to" acts Polymarket US takes under the color of that federal authority, and (3) Polymarket US has a "colorable federal defense." *Plaquemines,* 146 S. Ct. at 1057–58. Because Section 1442 authorizes removal of the "civil action," once those requirements are met, the entire action belongs in federal court. 28 U.S.C. § 1442(a)(1); *see also Donohue v. CBS Corp.*, 2017 WL 5713222, at *4 (S.D.N.Y. Nov. 27, 2017) ("When a federal officer removes a case under § 1442, 'the entire case against all defendants, federal or non-federal, is removed to federal court[.]'") (citation omitted); *see also Torres v. CBS News*, 854 F. Supp. 245, 246 n.2 (S.D.N.Y. 1994).

40. Notably, Section 1442 does not require Polymarket US to show that the CFTC or any CFTC official specifically directed the precise transaction, event-contract listing, or state-specific access decision Plaintiff challenges. The statute separates two questions: whether Polymarket US acts under a federal officer, and whether this suit is "for or relating to" acts taken under color of that federal authority. *Plaquemines* confirms that the second requirement is satisfied by a non-tenuous relationship between the challenged conduct and the defendant's federal duties; it does not collapse the acting-under inquiry into a requirement that the agency specifically command the challenged act. 146 S. Ct. at 1060–61. Here, Polymarket US acts under the CFTC

when it performs federally delegated functions as a designated contract market, and Plaintiff's suit related to those functions because it targets market access, contract listing, trading, surveillance, compliance, enforcement, and market safeguards.

41. *First*, Polymarket US is a "person acting under" the CFTC and its officials. 28 U.S.C. § 1442(a)(1). A limited liability company is a "person" under the removal statute. 1 U.S.C. § 1 (defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136 (2d Cir. 2008) ("[T]he term 'person' includes corporate persons."). Polymarket US acts under the CFTC because it "'assist[s]' and 'help[s] carry out the duties or tasks of the'" agency. *Isaacson*, 517 F.3d at 137 (alterations adopted).

42. Polymarket US operates its designated contract market subject to the CFTC's direction and "an unusually close [relationship] involving detailed regulation, monitoring, [and] supervision." *Machnik v. Buffalo Pumps Inc.*, 2007 WL 4570566, at *1 (D. Conn. Dec. 20, 2007). Polymarket US does more than merely comply with the CEA's highly detailed regulatory scheme; as a contract market, it exercises delegated federal authority to "promulgate[] rules and regulations" governing market participants. *Merrill Lynch*, 456 U.S. at 382.

43. To operate as a designated contract market, Polymarket US is charged with establishing and enforcing various rules to carry out the CEA's objectives, all under the CFTC's oversight. For example, Polymarket US's conduct and rules must comply with the CEA's 23 core principles and all CFTC rules governing market access, contract design, surveillance, enforcement, financial safeguards, and customer protection. *See* 7 U.S.C. §§ 7(d), 8(a); 17 C.F.R. §§ 38.3(a), 38.151. The CFTC has "sweeping authority" to enforce the CEA and its regulations. *CFTC v. Schor*, 478 U.S. 833, 842 (1986). The CEA expressly authorizes the CFTC to "review and

approv[e] . . . event contracts" and thereby permit those contracts to be "listed" for "trading" on federally registered exchanges. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). It may suspend or revoke a contract market's designation, 7 U.S.C. §§ 7b, 8(b), bring administrative enforcement actions, *id.* §§ 9, 13b, and sue in federal court for injunctive relief, rescission, trading bans, registration bans, and other relief, *id.* § 13a-1.

44. The relationship between Polymarket US and the CFTC goes well beyond the fact of federal regulation alone to include tasks the federal government would otherwise perform. The CEA creates "a system of effective self-regulation of trading facilities . . . under the oversight of the Commission." 7 U.S.C. § 5(b). CFTC regulations define contract markets as "self-regulatory organization[s]." 17 C.F.R. § 1.3; *see also* 17 C.F.R. § 1.52(a)(2).

45. Congress granted "self-regulatory organizations such as contract markets . . . a form of delegated [government] discretion" to adopt, implement, and enforce regulatory protections—authority that, without contract markets, the CFTC would otherwise exercise itself. *Barry v. Cboe Glob. Mkts., Inc.*, 42 F.4th 619, 625 (7th Cir. 2022); *see also* 17 C.F.R. § 1.3 (including contract markets within the definition of "self-regulatory organization"); CFTC, *Prediction Markets: Public Interest Determinations*, 91 Fed. Reg. 35,806, 35,843 (June 12, 2026) (explaining that designated contract markets "are required to operate as self-regulatory organizations, subject to Commission oversight, with statutory duties to enforce the rules adopted by their own governing bodies").

46. Courts, including the Second Circuit, have consistently held that self-regulatory organizations exercise "quasi-governmental powers" and authority "delegated to it pursuant to" federal law "and the regulations and rules promulgated thereunder." *D'Alessio v. New York Stock Exch., Inc.*, 258 F.3d 93, 106–07 (2d Cir. 2001) (stock exchange, "as a [self-regulatory

organization], stands in the shoes of the SEC in interpreting the securities laws for its members and in monitoring compliance with those laws" and is therefore "entitled to the same immunity"); *see also DL Capital Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 97 (2d Cir. 2005) (similar); *MFS Sec. Corp. v. SEC.*, 380 F.3d 611, 621 (2d Cir. 2004) (similar); *Bruan, Gordon & Co. v. Hellmers,* 502 F. Supp. 897, 902 (S.D.N.Y. 1980) (finding that the National Association of Securities Dealers, Inc., a self-regulatory organization, is "acting under the SEC . . . for purposes of determining jurisdiction"); *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008) (holding that self-regulatory organization was immune for actions exercising authority "delegated by the SEC"); *Mohlman v. Fin. Indus. Regul. Auth., Inc.*, 2020 WL 905269, at *3–4 (S.D. Ohio Feb. 25, 2020) (collecting cases for same proposition), *aff'd on other grounds*, 977 F.3d 556 (6th Cir. 2020). The relationship between Polymarket US and the CFTC therefore goes well beyond that of a highly regulated entity subject to comprehensive supervision.

47. In its role as a self-regulatory organization, Polymarket US is specifically charged with a broad array of functions. For example, a designated contract market is required to "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2).

48. A designated contract market also has the "responsibility to prevent manipulation, price distortion, and disruptions . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. § 7(d)(4).

49. A designated contract market likewise must "establish and enforce rules" "to protect markets and market participants from abusive practices committed by any party, including abusive practices committed by a party acting as an agent for a participant." 7 U.S.C. § 7(d)(12).

To that end, it also must "maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information" "to assist in the prevention of customer and market abuses." *Id.* § 7(d)(10).

50. These rules, the CFTC has explained, "establish important protections for derivatives markets, market participants, and the general public." CFTC N.Y. Compl. ¶ 36.

51. Polymarket US also performs federally supervised rule- and product-listing functions. To implement or revise a rule, a designated contract market must either submit the rule for CFTC approval or certify that the rule complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). The CFTC may allow the rule to go into effect, or it may stay the rule's certification pending further review. *Id.* § 7a-2(c)(2)–(3).

52. Similarly, to list new event contracts, the entity must either submit the event contract for CFTC approval or certify that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1), (4)(A), (5)(C); 17 C.F.R. §§ 40.2(a), 40.3(a), 40.11(c). The CFTC retains authority to investigate, stay, or amend the contract after it has been listed. 17 C.F.R. § 40.2(c). If the CFTC determines that a proposed "[e]vent contract" involves certain subjects, including "gaming," it has the discretion to prohibit the listing if the contract would be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

53. The CFTC's retained authority confirms the "acting under" relationship. Federal agencies necessarily retain ultimate authority over delegated regulatory functions, and Section 1442 does not require a private entity to exercise unfettered government power. The CFTC's authority to review, stay, amend, prohibit, or require changes to the rules and event-contract listings on a designated contract market—and to suspend or revoke a contract market's designation—shows that Polymarket US performs federal market-regulatory work under federal

subjection, guidance, and control. That is the relationship *Watson* describes as "acting under": assistance to a federal superior in carrying out federal tasks, not independent private action. *Watson*, 551 U.S. at 151–54.

54. Once contracts are listed, designated contract markets must "provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process." 7 U.S.C. § 7(d)(9)(A). They must also "establish, monitor, and enforce compliance with" rules relating to "access requirements," *id.* § 7(d)(2)(A)(i), and "establish and enforce rules . . . to promote fair and equitable trading on the contract market," *id.* § 7(d)(12)(B). To that end, CFTC regulations impose additional "impartial access" requirements, mandating that a contract market provide market participants with nondiscriminatory access and adopt and fairly enforce rules governing denials, suspensions, and terminations of access. 17 C.F.R. § 38.151(a)–(c).

55. In all of these respects, a designated contract market exercises authority delegated by the federal government, "perform[ing] a job that . . . the Government itself would have had to perform." *Watson*, 551 U.S. at 154. Because Polymarket US's actions involve "an effort to assist, or to help carry out, the duties or tasks of the federal superior," the CFTC, Polymarket US "'act[s] under'" that agency. *Id*. at 152.

56. ***Second***, Plaintiff's lawsuit is "for or relating to" actions Polymarket US takes under the authority, supervision, and jurisdiction of the CFTC. The "for or relating to" element "sweeps broadly." *Plaquemines*, 146 S. Ct. at 1060. "One thing can relate to another even if the connection is indirect," and "even without a strict causal relationship." *Id*. (internal quotation marks omitted). *Plaquemines* confirms that the defendant need not show that the federal government specifically required or strictly caused the challenged conduct. 146 S. Ct. at 1060. It is enough that the

defendant plausibly alleges a close relationship between the challenged conduct and the performance of federal duties. *Id.* at 1060–61.

57. That requirement is easily satisfied here. Plaintiff does not challenge collateral commercial conduct remote from Polymarket US's federal role. Plaintiff challenges activity of the designated contract market itself: Polymarket US's offering and listing of federally regulated event contracts, its provision of access to its federally regulated exchange, and the safeguards and rules through which it operates that exchange. Pet. ¶¶ 4–5, 13–14, 39–57, 82–83, 90–92, 95–145. In particular:

a. Federal law requires Polymarket US to "establish, monitor, and enforce [its users'] compliance" with its rules, including by setting "the terms and conditions of any contracts to be traded on the contract market" and "detect[ing], investigat[ing], and apply[ing] appropriate sanctions" to violators. 7 U.S.C. § 7(d)(2)(A)–(B). But Plaintiff takes issue with—and attempts to alter—the types of event contracts offered on Polymarket US's platform and seeks to impose liability on Polymarket US based on event contracts that are allegedly illegal under state law. *See* Pet. ¶¶ 12–14, 41–51, 95–145.

b. Federal law directs Polymarket US to "establish, monitor, and enforce compliance" with "access requirements," 7 U.S.C. § 7(d)(2), and provide "impartial access to its markets and services," including by "establish[ing] and impartially enforc[ing] rules governing denials, suspensions, and revocations" of access, 17 C.F.R. § 38.151(b)–(c). But Plaintiff says that offering its platform and operating in New York constitutes "repeated and persistent violations of the New York Constitution, New York Penal Law, the Racing Law, and Wire Act." Pet. ¶ 91. On that basis,

Plaintiff seeks to alter Polymarket US's terms of access. Pet. ¶ 92. Similarly, Polymarket US permits those who have "attained the age of majority in [their] state and/or country of residence," to transact on the exchange. Individual Participant and Clearing Member Agreement § 2(1).[1] Plaintiffs, on the other hand, want to restrict trading for those under 21. Pet. at 29 (Prayer for Relief ¶ A(b)); *see also id.* ¶¶ 28, 130.

c. Federal law requires Polymarket US to "establish, monitor, and enforce [its users'] compliance" with its "rules prohibiting abusive trade practices on the contract market" and to "prevent manipulation" and "price distortion . . . through market surveillance, compliance, and enforcement practices and procedures." 7 U.S.C. §§ 7(d)(2)(A), 7(d)(4); see also 17 C.F.R. § 38.651 (requiring Polymarket US to "have and enforce rules that are designed to promote fair and equitable trading and to protect the market and market participants from abusive practices"). Plaintiff nonetheless claims that Polymarket US "create[s] significant risks" to its users' "financial well-being." Pet. ¶ 89.

58. In other words, the connection "between [Polymarket US's] challenged conduct and the performance of its federal duties" is hardly "tenuous, remote, or peripheral"—it is close and direct. *Plaquemines*, 146 S. Ct. at 1061. To be sure, "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct," *id*. at 1060, but here, Polymarket US's federal obligations do precisely that. The suit targets the precise federally delegated functions that make a contract market a contract market: market access, contract listing, rulemaking, surveillance, and enforcement under CFTC oversight.

[1] https://polymarketexchange.com/files/legal/latest/participant-agreement.

59. *Third*, Polymarket US has a "colorable federal defense." *Plaquemines*, 146 S. Ct. at 1057–58. Plaintiff's claims are preempted by federal law, which "present[s] a colorable federal defense" for the purposes of Section 1442. *Yeend v. Akima Glob. Servs., LLC*, 2021 WL 3721420, *9 (N.D.N.Y. Aug. 23, 2021) (permitting removal on the basis of a "colorable federal preemption defense"). At the removal stage, Polymarket US need not prove that the defense will ultimately prevail; it need only show that the defense is colorable. *Acker*, 527 U.S. at 431 (noting that a defendant need not "win his case before he can have it removed").

60. Preemption follows from the express language of the CEA, which grants "exclusive jurisdiction" over exchange-traded swaps to the CFTC, not state regulators. 7 U.S.C. § 2(a)(1)(A). Federal law authorizes the CFTC, not state regulators, to determine whether event contracts involve "gaming" and whether such contracts may be listed on federally regulated exchanges. 7 U.S.C. § 7a-2(c)(5)(C). The Third Circuit has held that the CEA "preempts state laws that directly interfere with swaps traded on [contract markets]," and that event contracts traded on a CFTC-licensed contract market are "swaps" subject to the CFTC's exclusive jurisdiction. *Flaherty*, 172 F.4th at 226–228.

61. That defense is more than colorable. The CFTC itself has filed lawsuits and amicus briefs to protect its exclusive jurisdiction over event contracts traded on CFTC-designated contract markets, including here in New York. It has explained that state efforts "intrude[] on the exclusive federal scheme Congress designed to oversee national swaps markets," and would "undermine[] [the] uniformity" Congress mandated, CFTC N.Y. Compl. ¶¶ 6–7, 66, by subjecting CFTC-regulated exchanges to a "fragmented patchwork of state regulations" that have "resulted in poorer consumer protection and increased risk of fraud and manipulation," *CFTC Sues Trio of States to Reaffirm its Exclusive Jurisdiction Over Prediction Markets*, CFTC Press Release No. 9206-26

(Apr. 2, 2026). *See also, e.g.,* CFTC Sixth Cir. Amicus Br. at 1–2; Complaint ¶¶ 5–6, 67, *United States v. Wisconsin*, No. 2:26-cv-00749 (E.D. Wis. Apr. 28, 2026), Dkt. 1. Federal courts have agreed in materially similar cases. *See Flaherty*, 172 F.4th at 226–28; *United States v. Minnesota*, 2026 WL 2150211, at *14; *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *7–10 (M.D. Tenn. Feb. 19, 2026).

62. Congress enacted that exclusive federal scheme to ensure that market participants are regulated "under the oversight of the Commission," 7 U.S.C. § 5(b), and not by a fragmented set of state agencies. *See Curran*, 456 U.S. at 386; *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1157 (7th Cir. 1992) (state efforts to interfere with "the operation of a contract market" are preempted by the CEA). Plaintiff's attempt to impose state gambling, sports-wagering, licensing, consumer-protection, nuisance, or similar laws on Polymarket US's federally designated exchange directly conflicts with that scheme.

63. "One of the primary purposes of the removal statute . . . was to have [federal officers'] defenses litigated in the federal courts." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). "State-court proceedings may reflect 'local prejudice' against unpopular federal laws and federal officials." *Watson*, 551 U.S. at 150. And private parties likewise may face "a significant risk of state-court 'prejudice.'" *Id.* at 152.

64. This case exemplified the danger federal officer removal was designed to prevent. Plaintiff seeks an injunction barring Polymarket US from offering event contracts on its federally regulated designated contract market to New York residents. That fractures national derivatives markets and undermines the uniformity Congress sought to achieve through "a system of effective self-regulation of trading facilities . . . under the oversight of the [CFTC]." 7 U.S.C. § 5(b). Congress enacted federal officer removal precisely to "protect the Federal Government" and those

"who lawfully assist" it from such "interference with [their] operations." *Watson*, 551 U.S. at 150–51 (citation omitted).

65. This Court can and should recognize its jurisdiction under Section 1442(a)(1) to ensure that Polymarket US's preemption defense is fairly and fully litigated.

**ALL REMOVAL REQUIREMENTS ARE MET**

66. Based on the foregoing facts and allegations, this Court has original jurisdiction over this action because Plaintiff's claims are for or relating to actions that Polymarket US took under color of federal office.

67. Based on the foregoing facts and allegations, this Court also has original jurisdiction over this action because the Petition necessarily raises substantial, disputed federal questions that belong in a federal court.

68. Venue is proper in this Court because the United States District Court for the Southern District of New York is the federal judicial district embracing the Supreme Court of New York, New York County, where Plaintiff originally commenced the state court action. 28 U.S.C. §§ 1391, 1441(a), 1446(a).

69. Removal is timely because Polymarket US has not yet been served, meaning it necessarily has not been more than 30 days since service of Plaintiff's Petition. 28 U.S.C. §§ 1446(b)(1), (2)(B).

70. Copies of all available process, pleadings, and orders are attached hereto as Exhibits A–I. 28 U.S.C. § 1446(a).

71. Polymarket US will provide Plaintiff with written notice of this filing and will promptly file a true and correct copy of this Notice of Removal with the Clerk of the Supreme

Court of New York. The Notice of Filing of Notice of Removal to be filed with Supreme Court of New York is attached as Exhibit J. 28 U.S.C. § 1446(d).

72. By filing this Notice of Removal, Polymarket US does not waive any objections as to notice, service, personal jurisdiction, venue, or any other defenses. Polymarket US reserves all of its defenses, and this Notice of Removal is filed subject to full reservation of any rights and all objections, arguments, and defenses to Plaintiff's Petition.

## CONCLUSION

73. Polymarket US hereby removes this action and respectfully requests that the Court retain jurisdiction for all further proceedings in this matter.

Dated: September 24, 2026

Respectfully submitted,

*/s/ Orin Snyder*

GIBSON DUNN & CRUTCHER LLP

Orin Snyder
Matt Benjamin
Rachel Jackson* (admission pending)
Amanda LeSavage
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
rjackson@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

**Applications for admission forthcoming*

*Attorneys for Defendant QCX LLC, d/b/a Polymarket US.*